In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-13-00509-CV

THE CITY OF CONROE, TEXAS AND J.R. MOORE JR., IN HIS CAPACITY AS THE MONTGOMERY COUNTY TAX ASSESSOR AND COLLECTOR, Appellant

V.

TPPROPERTY LLC, Appellee

On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 12-05-05458 CV

**OPINION**

Appellant, the City of Conroe ("City") appeals the denial of its plea to the jurisdiction. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 51.014(a)(8), 101.001(3) (West Supp. 2014). The City contends the trial court erred when it denied the City's plea because (1) TPProperty LLC ("TPProperty") failed to exhaust its exclusive administrative remedies under the Texas Tax Code concerning the disputed Tax Abatement Agreement and (2) TPProperty failed to establish a

1

waiver of the City's immunity to suit regarding the Tax Abatement Agreement and the Tourism Promotion Services Agreement.

## I. Standard of Review

Subject-matter jurisdiction is essential for a court to have the authority to resolve a case, and trial courts lack such jurisdiction over a governmental unit that is immune from suit. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443 (Tex. 1993). A party may challenge a court's subject matter jurisdiction by filing a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). We review a trial court's ruling on a challenge to its subject matter jurisdiction de novo because jurisdiction is a question of law. *Miranda*, 133 S.W.3d at 228. In conducting this de novo review, we do not examine the underlying merit of the plaintiff's case, but consider only the plaintiff's pleadings and the evidence pertinent to the jurisdictional inquiry. *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex. 2002). The plaintiff has the burden to allege facts that affirmatively establish the trial court's subject matter jurisdiction. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. In determining whether the plaintiff has met this burden, we construe the pleadings liberally in favor of conferring jurisdiction. *Tex.*

2

*Dep't of Transp. v. Ramirez,* 74 S.W.3d 864, 867 (Tex. 2002); *Tex. Ass'n of Bus.,* 852 S.W.2d at 446.

## II. Background

This dispute centers around the La Torretta Lake Resort & Spa (the "Hotel")[1] located in the Lake Conroe Area. In April 2007, the Hotel was not in operation. French Quarter VIII, LLC, ("French Quarter") desired to purchase the Hotel, renovate it, and restart operations. Before agreeing to purchase the Hotel, French Quarter entered into two agreements with the City: (1) a Tax Abatement Agreement, which provided for the temporary abatement of certain ad valorem property taxes on improvements to the Hotel that French Quarter promised to construct ("Abatement Agreement"); and (2) a Tourism Promotion Services Agreement, which provided for French Quarter to manage the expenditure of a portion of the City's hotel occupancy taxes collected from the guests of the Hotel, for marketing and promoting tourism in the Lake Conroe area ("HOT Agreement"). In April 2007, French Quarter entered into these two agreements with the City and purchased the Hotel.

By December 2011, French Quarter completed all of the required improvements to the Hotel contemplated in the Abatement Agreement but

---

[1] La Torretta Lake Resort & Spa was formerly known as the Del Lago Resort Hotel and Conference Center.

defaulted on the loan from its lender, which resulted in a foreclosure and TPProperty's acquisition of the Hotel at the foreclosure sale. Subsequent to the foreclosure sale, French Quarter executed a transfer to TPProperty of all of its rights associated with the Hotel, if any, including, but not limited to, the subject agreements. TPProperty asserts that it continued to fulfill the obligations under the agreements in the same manner as French Quarter had operated prior to the foreclosure and is entitled to the benefits of such agreements.

On February 14, 2012, the City sent notice of default letters to TPProperty, claiming that both the Abatement Agreement and the HOT Agreement were in default and contending, at least in part, that the Hotel failed to properly report certain information to the City and failed to provide sufficiently detailed budgets. In response to the notice, TPProperty amended its HOT Budget to expand significantly on the details, including items in the budget that it contends the City had never before requested or required of French Quarter. On April 12, 2012, Conroe's City Council adopted a resolution declaring the Abatement Agreement in default and refusing to approve the revised budget that TPProperty submitted to satisfy the terms of the HOT Agreement. On May 7, 2012, Conroe's City Council entered a resolution terminating the HOT Agreement.

4

Thereafter, TPProperty filed suit against the City and the Montgomery County Tax Assessor and Collector[2] seeking damages based on the City's alleged breach of the Abatement Agreement and the HOT Agreement, seeking a court order to compel specific performance of both agreements, and for declaratory relief regarding the parties' rights, status, and legal relationship under both agreements. TPProperty also sued the Montgomery Central Appraisal District ("MCAD") for its alleged refusal to process TPProperty's tax abatement application or otherwise grant TPProperty the tax abatements under the Abatement Agreement. TPProperty also sought declaratory relief against MCAD asking the court to declare that MCAD is not entitled to refuse to process TPProperty's tax abatement applications.[3]

The City filed its answer alleging various defenses and affirmative defenses. The City subsequently filed counterclaims against TPProperty for the collection of ad valorem property taxes and hotel occupancy taxes, together with statutory penalties, interest, and attorney's fees. The City further sought a temporary injunction to enjoin TPProperty from expending any hotel occupancy taxes that it had collected since October 1, 2011. MCAD filed a general denial.

---

[2] The Montgomery County Tax Assessor and Collector serves as the City's Tax Assessor and Collector through a contractual agreement.

[3] MCAD is not a party to this appeal.

5

Sometime later, the City filed a plea to the jurisdiction asserting: (1) the trial court lacked subject matter jurisdiction over TPProperty's claims related to the Abatement Agreement because TPProperty failed to exhaust its administrative remedies under the Tax Code; and (2) the trial court lacked subject matter jurisdiction over both the Abatement Agreement claims and the HOT Agreement claims because TPProperty's pleadings do not establish a waiver of the City's governmental immunity to suit. After a hearing, the trial court denied the City's plea to the jurisdiction, and the City timely appealed.

### III. Governmental Immunity

Sovereign immunity protects the State, as well as its agencies and officials, from lawsuits for damages and from liability. *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323-24 (Tex. 2006). Governmental immunity provides similar protection to political subdivisions of the State, including counties, cities, and school districts. *See Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). Like sovereign immunity, governmental immunity includes immunity from suit, which deprives a court of subject matter jurisdiction, and immunity from liability, which protects entities from judgments. *City of Dallas v. Albert*, 354 S.W.3d 368, 373 (Tex. 2011). "Immunity from suit bars a suit against the State

6

unless the Legislature expressly consents to the suit." *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). "If the Legislature has not expressly waived immunity from suit, the State retains such immunity even if its liability is not disputed." *Id*. "Immunity from liability protects the State from money judgments even if the Legislature has expressly given consent to sue." *Id*. Immunity from liability is an affirmative defense, not a jurisdictional bar. *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). Therefore, we concern ourselves solely with the issue of governmental immunity from suit in this appeal.

A city is a political subdivision protected by governmental immunity. *Taylor*, 106 S.W.3d at 694 n.3; *City of LaPorte v. Barfield*, 898 S.W.2d 288, 291 (Tex. 1995), *superseded by statute on other grounds, as recognized in Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 54-55 (Tex. 2011)). Governmental immunity protects political subdivisions when they are performing governmental functions like those involved here.[4] *See Williams*, 353 S.W.3d at 134. Accordingly,

---

[4] "Governmental functions" are those functions that a unit carries out as an arm of the State for the purpose of serving the general public. *City of Houston v. Sw. Concrete Constr., Inc.*, 835 S.W.2d 728, 730 (Tex. App.—Houston [14th Dist.] 1992, writ denied). By contrast, proprietary functions are functions that a municipality may perform "for the benefit of private enterprise or the residents of the municipality rather than for the benefit of the general public." *Id*. The courts use the proprietary-governmental dichotomy to determine a municipality's

7

governmental immunity deprives the trial court of subject-matter jurisdiction for TPProperty's lawsuit against the City unless immunity has been waived or TPProperty's claims do not implicate immunity from suit in the first instance. *Miranda,* 133 S.W.3d at 224; *Wichita Falls State Hosp.,* 106 S.W.3d at 694 n. 3.

---

immunity from suit for tortious conduct, but the Texas Supreme Court has not held this same distinction determines whether immunity from suit is waived for breach of contract claims. *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006). There is a split in authority among some appellate courts regarding whether the proprietary-governmental dichotomy applies in contract claims following the enactment of chapter 271. *See City of Georgetown v. Lower Colo. River Auth.*, 413 S.W.3d 803, 811 (Tex. App.—Austin 2013, pet. dism'd) (holding that there was no principled reason why the dichotomy should apply to tort claims but not contract claims under the common law); *City of San Antonio ex rel. City Pub. Serv. Bd. v. Wheelabrator Air Pollution Control, Inc.*, 381 S.W.3d 597, 603-05 (Tex. App.—San Antonio 2012, pet. denied) (holding that the proprietary-governmental dichotomy is not applicable to claims sounding in contract).

Here, TPProperty complains of the City's actions regarding the HOT Agreement, which concerns the collection of hotel occupancy taxes, and the Abatement Agreement, which concerns the collection of ad valorem taxes. For purposes of tort liability, the Legislature has statutorily included "tax collection" among a municipality's governmental functions. Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(26) (West Supp. 2014). The classification between a proprietary and governmental function is no different under the common law. *See Tooke*, 197 S.W.3d at 343-44; *see also City of San Angelo v. Deutsch*, 91 S.W.2d 308, 309 (Tex. 1936) ("The collection of taxes is undoubtedly a governmental function."). Because TPProperty's claims involve the City's collection of taxes, a governmental function, we need not decide whether the dichotomy applies because even assuming it did, the City has governmental immunity.

## IV. Waiver of Governmental Immunity

The City argues that the trial court erred in denying its plea to the jurisdiction regarding the Abatement Agreement and the HOT Agreement claims because TPProperty has failed to establish a waiver of the City's immunity from suit. TPProperty asserts that immunity has been waived in three ways. First, TPProperty argues that section 271.152 of the Local Government Code waived the City's immunity. Second, TPProperty argues that the City waived immunity by "asserting counterclaims against TPProperty that are 'connected with' and 'germane to' TPProperty's claims[.]" Third, TPProperty argues that the City waived immunity by its conduct.

### A. Waiver of Immunity under Local Government Code Chapter 271

TPProperty argues that Local Government Code Chapter 271 waives the City's immunity under both the Abatement Agreement and the HOT Agreement. When a governmental unit enters into a contract, it makes itself potentially liable on the contract, and therefore, waives its immunity from liability; however, the governmental unit retains its immunity from suit on the contract unless that immunity has been specifically waived. *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594-97 (Tex. 2001). The party suing the governmental unit must affirmatively demonstrate the court's jurisdiction by

9

alleging a valid waiver of immunity. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). The plaintiff bears the burden of establishing that the government consented to suit, "which may be alleged either by reference to a statute or to express legislative permission." *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). TPProperty alleges the City "waived immunity from suit and liability, as this case involves contracts for goods and services that are proprietary in nature and governmental immunity is waived under Texas Local Government Code Chapter 271 for suits on such contracts."

Section 271.152 of the Local Government Code waives immunity from suit for certain breach of contract claims. *See* Tex. Loc. Gov't Code Ann. § 271.152 (West 2005). The statute provides:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

*Id*. The plain language of the statute "allows for enforcement of contracts against local governmental entities by waiving their immunity from suit." *Ben Bolt*, 212 S.W.3d at 327. There is no dispute that the City is a local governmental entity under the statute. The principal dispute between the parties in this issue is whether the agreements include an agreement for TPProperty to provide goods or services

10

to the City, making the contracts subject to the terms and conditions of the quoted subchapter.

The statute defines a "'[c]ontract subject to this subchapter'" as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity[.]" Tex. Loc. Gov't Code Ann. § 271.151(2)(A) (West Supp. 2014).[5] Courts must look beyond the title of a written contract to determine whether it satisfies this requirement. *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 301 (Tex. 2014). In *Church & Akin*, the Supreme Court explained that,

> a written contract that triggers chapter 271's waiver of immunity is one that states the essential terms of an agreement to provide goods or services to the local governmental entity, regardless of the document's title and even if the provision of goods and services is not the primary purpose of the contract.

*Id*. at 302. The agreements at issue here are written contracts that state their essential terms. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000) (noting that a contract is legally binding "if its terms are sufficiently definite to enable a court to understand the parties' obligations").

---

[5] We cite to the current version of the statute because the amendments do not affect the disposition of this appeal.

11

Statutory construction is a question of law, which we review de novo. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). In our determination of whether the agreements fall under the scope of section 271.152, we look at the Legislature's intent and construe the statute's words according to their plain meaning unless a different meaning is supplied by the legislative definition or is apparent from the context. *See id.* Chapter 271 does not define the term "services." *See* Tex. Loc. Gov't Code Ann. § 271.001-.908 (West 2005 & West. Supp. 2014); *see also Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010). The Texas Legislature enacted section 271.152 "to loosen the immunity bar so 'that *all* local governmental entities that have been given or are given the statutory authority to enter into contracts shall not be immune from suits arising from those contracts.'" *Ben Bolt*, 212 S.W.3d at 327 (quoting House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 2039, 79th Leg., R.S. (2005)). In *Kirby Lake*, the Supreme Court observed that the term "services" "is broad enough to encompass a wide array of activities." 320 S.W.3d at 839. Texas courts have held that the term "services" includes "'any act performed for the benefit of another[.]'" *See Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex. 1962) (quoting *Creameries of Am., Inc. v. Indus. Comm'n*, 98 Utah 571, 102 P.2d 300, 304 (1940)). However,

12

the term does not extend to contracts that benefit a local governmental entity only indirectly, or in some attenuated manner. *Berkman v. City of Keene*, 311 S.W.3d 523, 527 (Tex. App.—Waco 2009, pet. denied) (op. on reh'g). The "services" must be provided to the local contracting governmental entity. *See Kirby Lake*, 320 S.W.3d at 838-39; *see also N. Cent. Tex. Council of Gov'ts v. MRSW Mgmt., LLC*, 405 S.W.3d 364, 371 (Tex. App.—Austin 2013, pet. denied). The First Court of Appeals in *East Houston Estate Apartments, L.L.C. v. City of Houston* further explained the limitations on the word "services" in the statute:

> If every contract that confers some attenuated benefit on a governmental entity constitutes a contract for a "service," the limitation of contracts covered by section 271.152 to "contract for goods or services provided to the entity" loses all meaning. Nothing in the statute [or] in its legislative history supports such an interpretation. Had the legislature intended to waive immunity from liability for every contract participated in by the State, it could have done so. We must interpret the limitation as having some meaning.

294 S.W.3d 723, 736 (Tex. App.—Houston [1st Dist.] 2009, no pet.). A number of appellate courts have evaluated whether a specific contract included a provision for a service to the governmental entity thereby prompting section 271.152's waiver of immunity.

In *Dallas Area Rapid Transit* ("DART") and *Hoppenstein Properties, Inc.*, the courts found that the contracts included an agreement for services to the governmental entity and that section 271.152's waiver of immunity from suit was

13

applicable. *Dallas Area Rapid Transit v. Monroe Shop Partners, Ltd.*, 293 S.W.3d 839, 841 (Tex. App.—Dallas 2009, pet. denied); *Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.*, 341 S.W.3d 16 (Tex. App.—Waco 2010, pet. denied) (op. on reh'g). In *DART*, the contract at issue established that DART would sell, and Monroe would purchase and develop certain historically significant property near a rail station. 293 S.W.3d at 840. DART terminated the contract when Monroe allegedly failed to obtain the financing required by the contract. *Id.* Monroe sued DART for breach of contract, but DART filed a plea to the jurisdiction based on governmental immunity. *Id.* Monroe contended that DART's immunity was waived under section 271.152. *Id.* DART argued that section 271.152 was not applicable because the contract at issue was for the sale of real estate and not one for goods or services. *Id.* at 841. The Dallas Court of Appeals disagreed and found that the contract included promises by Monroe to provide certain pre-closing and post-closing development services to DART. *Id.* DART argued that the development services in the contract were not for its benefit but for the benefit of the State of Texas as it was the State and not DART that had restricted the use of the historic property. *Id.* The Dallas Court of Appeals disagreed and concluded that DART and the State were not mutually exclusive in this context. *Id.* The court explained that the contract required Monroe to accept an

14

assignment of DART's responsibilities and restrictions in dealing with the historical nature of the property; get approval from DART on all construction documents related to the renovations; agree that all construction documents would belong to DART; obtain approval from DART on the construction company used by Monroe for the renovations; and perform a list of the specific construction work attached to the contract. *Id*. The court concluded that because of the agreement for these services, the contract was subject to the waiver of immunity under section 271.152. *Id*.

In *Hoppenstein*, the appraisal district and Hoppenstein entered into a lease agreement, which included a construction addendum that required Hoppenstein to complete certain renovations to the premises before the appraisal district would move in and occupy the renovated premises. 341 S.W.3d at 18-19. Hoppenstein was renovating the property specifically for the appraisal district's use. *Id*. When the appraisal district abandoned the premises before the end of the lease, Hoppenstein sued the appraisal district for breach of the lease. *Id*. at 18. The appraisal district claimed partial immunity from suit. *Id*. at 19. Hoppenstein argued that the appraisal district waived immunity pursuant to section 271.152. *Id*. The lease obligated Hoppenstein to renovate the premises according to a floor plan agreed to by the appraisal district and in a manner that proved satisfactory to the

appraisal district. *Id*. at 20. The court concluded that Hoppenstein contracted to renovate the premises for the appraisal district, a service that falls within the meaning of section 271.152. *Id*.

In a recent opinion of the Texas Supreme Court concerning this issue, the Court found that the agreement at issue, a lease, did not invoke section 271.152's waiver of immunity. *See Church & Akin*, 442 S.W.3d at 308-09. In *Church & Akin*, the Court considered whether the parties' lease agreement, which provided that the leased premises were to be used only as a marina, constituted a contract for "goods and services" under chapter 271. *Id.* at 303. The water district leased the premises to Church & Akin. *Id.* at 299. The lease provided that the premises were "'to be used only as a Lake marina, restaurant, gasoline and sundry sales and as a recreational facility,'" unless the water district consented to a different use. *Id*. The water district ultimately decided to terminate the lease, and Church & Akin filed suit for breach of contract alleging that the water district had no right to terminate the lease early. *Id*. The water district argued it was entitled to immunity from suit because the parties' agreement was a lease of real property, not an agreement to provide goods and services. *Id*. at 301. Church & Akin argued that the lease included agreements to provide services; specifically, the lease required Church & Akin to "'(1) operate the marina; (2) issue and redeem catering tickets; and (3)

16

return a percentage of its profits from sundry sales'" to the water district. *Id.* at 302.

The Court held that the lease did not require Church & Akin to operate a marina, but rather, required that if Church & Akin chose to use the property, the only allowable use was that of a marina without having received written consent for another use. *Id.* at 303. According to the Court, under the language of the lease, Church & Akin could have elected not to use the premises for any purpose. *Id.* The Court held that chapter 271 did not waive the water district's immunity from suit because "although the lease generally prohibited the lessee from using the property for any purpose other than operation of a marina, the lessee did not agree to provide marina-operation services or any other goods or services to the governmental entity." *Id.* at 299. The Court explained:

> When a party has no right under a contract to receive services, the mere fact that it may receive services as a result of the contract is insufficient to invoke chapter 271's waiver of immunity. At best, such services are only an "indirect" and "attenuated" benefit under the contract.

*Id.* at 303. The Court explained that even if the lease could be read to include an agreement that Church & Akin would use the property as a marina, any marina services that Church & Akin provided were to the constituents of the marina, not the water district. *Id.* at 303-04. The Court also explained that the section 271.152

17

waiver "will typically apply only to contracts in which the governmental entity agrees to pay the claimant for the goods or services that the claimant agrees to provide to the governmental entity." *Id*. at 304. The Court found that the contract at issue created a leasehold interest and did not contain an agreement for the water district to pay Church & Akin any amount. *Id*. at 305. Thus, the absence of any provision in the contract where the water district agreed to pay Church & Akin for services was found to be further support that the agreement did not provide services to the governmental entity, as contemplated by the statute. *Id*. The Court concluded that the lease did not require Church & Akin to provide marina-operation services and at best, the operation of the marina only indirectly benefited the water district. *Id*.

The Court further analyzed whether a catering ticket provision in the lease invoked the statutory waiver for providing services to the governmental entity. *Id*. at 305-07. Church & Akin argued that the catering tickets would benefit the water district as well as Church & Akin because the issuance of the tickets would potentially increase the amount of marina sales and thus increase the amount that Church & Akin would pay to the water district as rent. *Id*. at 306-07. The Court concluded, "even to the extent the tickets may have increased marina sales, any indirect benefit to the [w]ater [d]istrict from Church & Akins['] increased profits

18

could not, alone, convert Church & Akin's efforts to promote its own business into services *to the [w]ater [d]istrict*."(emphasis in original) *Id*.

Last, the Court examined whether the inclusion of profit-based rent (an agreement to pay rent in the amount of 5% of its gross revenue for sales of products other than gasoline) created a contract for services to the water district. *Id*. at 308. The Court held the agreement did not require that Church & Akin have any sales proceeds. *Id*. The Court concluded that the lease did not constitute an agreement to generate sales revenue, operate a marina, or provide any other services to the water district. *Id*. The Court then dismissed Church & Akin's breach of contract claims for lack of jurisdiction. *Id*. at 308-09.

This Court recently decided *South East Texas Regional Planning Commission v. Byrdson Services, LLC*, in which we held that the trial court should have granted the planning commission's plea to the jurisdiction. 454 S.W.3d 581, 583 (Tex. App.—Beaumont Jan. 22, 2015, pet. filed). In that case, Byrdson entered into various contracts with individual homeowners and the planning commission. *Id*. at 583, 587. Under the contracts, Byrdson agreed to perform repair work on homes that had been damaged by Hurricane Ike using money from a limited public fund. *Id*. at 588. The planning commission was obligated to oversee the projects and disburse funds for the repairs in accordance with the contract terms. *Id*.

19

Byrdson brought suit based on the planning commission's alleged failure to pay Byrdson for services it had provided to homeowners and for the commission's cancellation of Byrdson's contracts. *Id*. at 591. Byrdson alleged the planning commission had waived immunity for breach of the contract claims under section 271.152. *Id*. at 584.

This Court concluded that Byrdson was obligated under the contracts to provide repair work to the homeowners that signed the contracts and not to the planning commission. *Id*. at 588. The court rejected Byrdson's claim that the planning commission had waived its immunity because the contracts required Byrdson to indemnify the planning commission from any potential third-party claims and to warrant its work. *Id*. at 588-90. The court explained that any benefits the planning commission might enjoy from these provisions were contingent and indirect. *Id*. at 590. Because Byrdson's lawsuit was not based on claims under a contract to provide goods and services to a local governmental entity, the trial court should have dismissed the suit based on governmental immunity. *Id*. at 591.

A number of appellate courts have also evaluated other types of contracts as providing at most an indirect, attenuated benefit to the State, and thus, not sufficient to invoke section 271.152's waiver of immunity. *See, e.g.*, *City of Canton v. Zanbaka, USA, LLC*, No. 12-12-00006-CV, 2013 WL 3377436, at *1, *3

(Tex. App.—Tyler July 3, 2013, pet. denied) (mem. op. on reh'g); *Berkman*, 311 S.W.3d at 527-28; *E. Houston Estate*, 294 S.W.3d at 736.

In *East Houston Estate*, the city entered into a loan agreement with East Houston Estate to assist in the rehabilitation of an apartment complex. 294 S.W.3d at 726. Funding for East Houston Estate's loan was provided through the federal government. *Id*. The city agreed to disburse the federal funds to East Houston Estate subject to certain terms and conditions in the loan agreement. *Id*. at 726, 735. After numerous construction delays, East Houston Estate filed for bankruptcy and the property was sold at foreclosure. *Id*. at 728. East Houston Estate sued the city claiming the city had breached its contract by failing to release all the funds allotted by the loan agreement. *Id*. The city filed a plea to the jurisdiction arguing that the loan agreement covered a community development activity, which is statutorily defined as a governmental function, and thus, the city was immune from suit for claims arising from the activity. *Id*. East Houston Estate argued that the city's immunity was waived under section 271.152. *Id*. at 729. East Houston Estate contended that its agreement with the city provided for East Houston Estate to provide the service of rehabilitating the apartment complex and providing low-income housing for city residents in exchange for the city's agreement to release to East Houston Estate all funds allocated by the loan agreement. *Id*. at 734. The First

21

Court of Appeals found that section 271.152 did not apply to the loan agreement. *Id*. at 735-36. The court explained:

> It is clear that, while the City would benefit in a general way from having East Houston's apartment units refurbished and from the availability of more housing for low-income families, nothing in the contract obligated East Houston to provide any municipal service directly to the City. The central purpose of the agreement between the City and East Houston was to facilitate a loan of money from the City's portion of federal funds and from private funds to a private entity for the purpose of renovating East Houston's empty apartment building. The City was thus a conduit of federal funds and a facilitator of the project, but no services were provided directly to the City. This is clearly not the type of "service" envisioned by section 271.152.

*Id*. at 736. The court concluded that any benefit to the city would be an indirect, attenuated benefit. *Id*.

In *Berkman*, the city entered into a contract to provide water and sewer services to a landowner for thirty-five years if the property was used on a continuous basis as a home for children who were wards of the State or, for twenty years if the property ceased to be used for that purpose. 311 S.W.3d at 524-25. The landowner argued that the agreement contained two services to the city—use of the property as a home for children who were wards of the State, and the filing of an annexation petition for the property. *Id*. at 527. The Waco Court of Appeals concluded that the city had no independent obligation to provide for the welfare of children who were wards of the State, thus the landowner's commitment to use the

property as such was a service to the State, not the city. *Id*. According to the court, if the landowner met the needs of parentless children in the city, then the city was the recipient of only an indirect benefit. *Id*. Likewise, the expansion of the city's tax base resulting from the annexation petition was only an indirect benefit to the city. *Id*. Because the court found that the benefits to the city under the contract were, at best, indirect or attenuated, it concluded that the contract was not an agreement subject to section 271.152's waiver of immunity provision. *Id*. at 527-28.

In *Zanbaka*, Canton Economic Development Corporation entered into an agreement with Zanbaka to fund a sewer line and lift station to its travel plaza. 2013 WL 3377436, at *1. The city delayed construction of the line and station after Zanbaka fulfilled certain requirements under the agreement. *Id*. Zanbaka filed suit for a declaratory judgment asserting it had entered into a contract subject to section 271.152. *Id*. Zanbaka argued that it provided goods and services to the city under the agreement when it allowed the city to annex its real property, when it created new jobs, and when it installed a fire hydrant on the property. *Id*. at *3. The city filed a plea to the jurisdiction arguing it was immune from suit. *Id*. at *1. The appellate court explained that despite the stated purpose of the agreement—to provide economic opportunities to the Canton area—the tangible objective of the

23

parties' agreement was to provide funding for the line and station. *Id*. at *3. The appellate court held that any benefits that flowed to the city from the construction of the line and station were thus indirect and attenuated, and that section 271.152 did not apply to such benefits. *Id*.

Here, TPProperty contends both agreements include provisions to provide "goods and services" to the City of Conroe. While TPProperty contends generally that the agreements include provisions for providing both "goods and services" to the City, TPProperty's arguments actually focus on the alleged provision of services and TPProperty does not appear to argue that the agreements include a provision for TPProperty to provide goods to the City. Considering the authorities discussed above, we now evaluate the Abatement Agreement and the HOT Agreement to determine if either agreement provides for services to the City.

**1. The Abatement Agreement**

According to TPProperty, the Abatement Agreement provides for services to the City in that French Quarter agreed to undertake the service of substantially renovating the Hotel and providing Conroe with a functional convention center. TPProperty argues that the Abatement Agreement explicitly required French Quarter to use the property as a hotel and convention center and to maintain all improvements to the property during the agreement's term. TPProperty contends

24

the agreement states that French Quarter is only entitled to the abatement of taxes if it completes the improvements. In further support of its contention, TPProperty asserts that the agreement requires French Quarter to provide reports to the City during the term of the agreement and, upon request from the City, requires French Quarter to provide documents necessary to verify the owner's compliance with the terms of the agreement.

Unlike the *DART* case discussed above, the Abatement Agreement does not provide a direct benefit to the City of Conroe. The transit authority in that case received a benefit by Monroe's assumption of the responsibilities and restrictions to maintain the historic nature of the property; here, we find no such direct benefit to the City. Unlike *Hoppenstein*, there is no evidence that the City had plans to lease or rent space at the Hotel. The renovations contemplated in the *Hoppenstein* agreement were for the appraisal district's direct use, whereas the renovations in this case are not for the City's use, but instead, are for the Hotel's use and benefit. In both *DART* and *Hoppenstein*, the agreement at issue contained provisions that allowed the governmental entity to direct, control, or approve the renovations because the respective city had a specific interest in the renovations taking place— in *DART*, the preservation of historical property; in *Hoppenstein,* that the renovations would meet the transit office's specific needs. The City of Conroe has

no such interest. The Abatement Agreement is more akin to those agreements where the courts have found any benefits received by the governmental entity were only indirect and attenuated.

The Abatement Agreement contains a use provision, which provides that French Quarter "shall use the Property for the purpose stated[.]" While the Abatement Agreement does not specifically state the property's purpose, it does indicate that the property presently functions as a resort hotel and conference center. The Abatement Agreement also contains a provision that allows the City to declare a default in the event that the number of persons employed at the hotel should fall below a certain number. Assuming this language is enough to establish that the Abatement Agreement required French Quarter to operate the facility at a certain capacity as a resort hotel and conference center, we conclude that any service provided in operating the Hotel would not be a service provided to the City. Additionally, we note that the Abatement Agreement does not contain an agreement for the City to pay French Quarter any amount for the specific service of operating or maintaining the Hotel. We conclude this type of service is not the type of service contemplated to invoke section 271.152's waiver of immunity. *See Church & Akin*, 442 S.W.3d at 303-05.

26

TPProperty argues further that the "service" provided to the City under the agreement is the renovation and maintenance of the Hotel. The Abatement Agreement provides that, "[t]he Owner contemplates making improvements . . . to the Property[.]" The Abatement Agreement identifies those improvements as including: repair, remodeling, and renovation of the Hotel. It also contains a provision that requires the owner to maintain these improvements throughout the abatement period. Under the agreement, once the improvements are completed in accordance with the terms of the agreement, French Quarter is entitled to the abatement of all taxes on the portion of the property's certified full market appraised value that exceeds the property's base year value.

In *East Houston Estate*, the court found that while the city would benefit in a general way from having an old apartment complex renovated and from the addition of more low-income housing, the benefits did not stem from the type of services envisioned by the statute because they were indirect and attenuated benefits. 294 S.W.3d at 736. Here, the City of Conroe may benefit from having an abandoned hotel renovated and operational, but that benefit is not derived from a service undertaken on behalf of the City. French Quarter undertook to renovate, maintain, and operate the Hotel for the same reasons most businesses are created—for profit.

27

Likewise, where the court found that the city in *Berkman* did not have an independent obligation to provide for the welfare of children, the City of Conroe does not have an independent obligation to improve the local economy. To the extent that the Abatement Agreement improved the City's economy, such would only be an indirect benefit to the City.

Finally, we acknowledge that the City's Tax Abatement Policy "is designed to stimulate continued economic growth in the City of Conroe" by providing financial benefits to businesses. However, the tangible objective of the Abatement Agreement was to free up French Quarter's funds through abatement of its property taxes and thus help it to shoulder the financial burden of the renovation project. While the City clearly anticipated that the Hotel's renovations might help stimulate the City's local economy, that type of benefit is more akin to the benefits observed in *Church & Akin*, *East Houston Estate, Berkman,* and *Zanbaka*—that is, the benefits, if any, are indirect or attenuated. *See Church & Akin*, 442 S.W.3d at 303-05; *Zanbaka*, 2013 WL 3377436, at *3; *Berkman*, 311 S.W.3d at 527-28; *E. Houston Estate Apartments*, 294 S.W.3d at 736.

We conclude that the Abatement Agreement is not a contract to provide goods or services directly to the City of Conroe and thus, the City did not waive its immunity from suit under section 271.152 by entering into such an agreement. *See*

28

Tex. Loc. Gov't Code Ann. § 271.152. To that extent, the trial court erred in denying the City's plea to the jurisdiction.

**2. The HOT Agreement**

TPProperty contends the HOT Agreement was also part of French Quarter's agreement to renovate the Hotel and provide the City with an operational convention center. TPProperty argues the HOT Agreement involves a provision of services for the same reasons it asserts to support its contention that the Abatement Agreement involved a provision of services. We need not address those arguments again, as they are no more persuasive in relation to the HOT Agreement than they were for the Abatement Agreement. However, TPProperty does specifically argue that under the HOT Agreement, French Quarter agreed to promote tourism on behalf of the City. TPProperty argues this service directly benefits the City and thus, subjects the agreement to section 271.152's waiver of immunity.

In the HOT Agreement, the City agreed to "dedicate and provide to French Quarter an amount equal to five-sevenths (5/7) of the HOT [r]evenues in consideration of the Services to be performed by French Quarter described in Article 3[.]" French Quarter agreed to use the HOT revenues "to promote tourism and the convention and hotel industry in the Lake Conroe area in the vicinity of the Land, including the promotion of the Center, and other tourist facilities located

thereon, on behalf of the City[.]" The HOT Agreement listed the "Services" French Quarter agreed to perform as including the "preparation and distribution of advertising and promotional materials;" "solicitations and promotional programs;" and "operational costs, including supplies, salaries, office rental, travel expenses, and other administrative costs." The HOT Agreement states, "French Quarter may satisfactorily perform the Services if its activities are construed to solely relate to the activities of facilities located on the Land."[6]

The City contends that French Quarter's retention and expenditure of HOT revenues to market the Hotel is not a service provided to the City because French Quarter, not the City, receives the main benefit of the HOT Agreement. The City contends that, at most, it might derive a general economic boost if the Hotel's business improves from marketing resulting from the HOT Agreement, but that benefit is indirect and secondary to the main purpose of the Agreement, which is the promotion of the Hotel.

---

[6] The HOT Agreement also contains various provisions requiring French Quarter to maintain the HOT revenues in a separate account, prepare annual budgets regarding the HOT revenues, make periodic reports to the City regarding expenditures, and to maintain complete books and records regarding any expenditures.

In evaluating the HOT Agreement, we find that although French Quarter is given the authority to use the HOT revenues, it is not required or obligated to use the revenues at all. Similar to the lease in *Church & Akin*, under the terms of the HOT Agreement, French Quarter could have elected not to use the HOT revenues for any purpose. The HOT Agreement contains a provision that states, "[u]nspent HOT revenues may be carried over by French Quarter to subsequent budget years." The agreement does not include a provision dictating the amount of HOT revenues, if any, French Quarter is required to spend each year, and it does not restrict the amount of HOT revenues French Quarter is allowed to carry over year to year. French Quarter only agreed to collect the funds[7] and that if it chose to use those funds, it agreed to use them "to promote tourism and the convention and hotel industry in the Lake Conroe area in the vicinity of the Land, including the

---

[7] Even without the HOT Agreement, French Quarter was required to collect hotel occupancy taxes. *See* CONROE, TEX., CODE OF ORDINANCES, art. II, § 62-36 (2007), *available at* https://www.municode.com/library/tx/conroe/codes/code_of_ ordinances?nodeId=PTIICOOR_CH62TA_ARTIIHOOCTA_S62-36CO ("Every person owning, operating, managing or controlling any motel or hotel within the city shall collect the tax imposed in section 62-32 for the city."). French Quarter was also required to "file a report with the director of finance, showing the consideration paid for all room occupancies in the preceding month, the amount of the tax collected on such occupancies, a copy of the corresponding hotel tax report for the State of Texas and any other information as the director of finance may reasonably require." *Id*. at art. II, § 62-37, *available at* https://www.municode.com/library/tx/conroe/codes/code_of_ordinances?nodeId=P TIICOOR_CH62TA_ARTIIHOOCTA_S62-37RE.

promotion of the Center, and other tourist facilities located thereon, on behalf of the City[.]" There is no language in the HOT Agreement that requires French Quarter to spend the HOT revenues; French Quarter was simply restricted from spending the revenues on anything other than the promotion of tourism as indicated in the agreement. We also acknowledge that while both parties may have contemplated that French Quarter would actually spend the revenues, the language in the HOT Agreement did not require it to do so and, in fact, included a provision that allowed it to roll over unspent funds from year to year. The City had no right under the HOT Agreement to receive the tourism promotion services of French Quarter nor did the City agree to pay French Quarter for such services. Such agreement simply allows the Hotel to expend a portion of the HOT revenues collected from its patrons directly for advertisement instead of turning them over to the City and to provide an accounting of such expenditures to the City. At best, the agreement only provides an indirect benefit to the City. Therefore, section 271.152's waiver of immunity does not apply. *See Church & Akin*, 442 S.W.3d at 303.

We conclude that the HOT Agreement is not a contract to provide goods or services directly to the City of Conroe and thus, the City did not waive its

32

immunity from suit under section 271.152. *See* Tex. Loc. Gov't Code Ann. §§ 271.151(2)(A), 271.152.

## B. Waiver by Asserting Affirmative Defense or Counterclaim

TPProperty also argues that the City waived its immunity by engaging in the litigation process. According to TPProperty, because the City has asserted counterclaims against TPProperty seeking recovery of ad valorem taxes abated under the Abatement Agreement and HOT revenues under the HOT Agreement, TPProperty's claims for breach of contract under the very same agreements are "'germane to, connected with, and properly defensive'" to the City's claims. Thus, TPProperty argues that the City has waived immunity from suit by asserting its counterclaims against TPProperty.

In *Reata*, the Court held that "when an affirmative claim for relief is filed by a governmental entity, . . . immunity from suit no longer completely exists for the governmental entity." *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 376 (Tex. 2006). The Court explained:

> [I]f the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs. If the opposing party's claims can operate only as an offset to reduce the government's recovery, no tax resources will be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted.

*Id*. at 375. The Court reasoned, "it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it." *Id*. at 375-76. In *City of Irving v. Inform Constr., Inc.*, the Court held that a city "does not have immunity from suit for claims germane to, connected with, and properly defensive to its counterclaim to the extent [the opposing party's] claims act as an offset against the [c]ity's recovery." 201 S.W.3d 693, 694 (Tex. 2006). The Court also explained that these rules apply even if the city's counterclaim is compulsory. *Id*.

Here, the City filed a counterclaim in conjunction with its answer to the lawsuit. Sometime thereafter, the City filed its Plea to the Jurisdiction. The City contends that by its counterclaim, it has not sought monetary relief under the Abatement Agreement, but that its claims seeking to foreclose on the tax liens for delinquent taxes are made contingent on and subject to the resolution of the tax exemption issues and are not counterclaims. The City argues that it has not asked the trial court to make a determination as to whether TPProperty was entitled to an exemption or to enforce any remedies under the Abatement Agreement.

With regard to the ad valorem taxes, the City filed a counterclaim alleging that it is entitled to recapture and collect the abated ad valorem taxes on the property for tax years 2009 through 2011 under the Texas Tax Code and under the

34

Abatement Agreement. The City asked for a judgment foreclosing the City's property tax liens against the property, securing the total amount of all delinquent property taxes, penalties and interest, and an order of sale requiring the foreclosed property to be sold.

The City further argues that its counterclaim regarding the hotel occupancy taxes does not request the type of monetary relief necessary to waive governmental immunity. The City filed a counterclaim seeking a judgment to require TPProperty to pay:

> a) the full amount of the hotel occupancy taxes that it collected from its customers during the months of October 2011 [through] July 2012, less the amount of any payments previously made to the City; b) an additional sum equal to 15% of the total amount of the HOT owed at the time of payment; c) the cost of an audit of the HOT revenues received during the period in question; d) the City's reasonable attorney's fees; and e) the City's costs of court.

The City also alleges that it is entitled to judgment for any additional hotel occupancy taxes, penalties, and attorney's fees that accrue during the pendency of the litigation. According to the City, such claims for relief seek only to enforce its statutory authority to impose and collect taxes.

Applying *Reata*, we must decide if TPProperty's claims for common law breach of contract damages are sufficiently related to the City's counterclaims; that is, whether TPProperty's breach of contract claims are "germane to, connected

35

with, and properly defensive to" the City's monetary claims, so as to fall within the trial court's limited jurisdiction to adjudicate such claims to the extent of offsetting any recovery by the City. *See Reata*, 197 S.W.3d at 376-77. The Texas Supreme Court has likened the term "germane to" with the term "relevant to." *See Albert*, 354 S.W.3d at 375 (citing BLACK'S LAW DICTIONARY 756 (9th ed. 2009)); *see also Sweeny Cmty. Hosp. v. Mendez*, 226 S.W.3d 584, 592 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (observing that the term "germane" generally means "'closely akin,'" "'being at once relevant and appropriate,'" "'closely or significantly related,'" "'relevant,'" and "'pertinent[]'" (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 525 (11th ed. 2003) and RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 800 (2d ed. 2001))). "In common usage, the term 'connected' means 'united, joined or linked' and 'joined together in sequence; linked coherently' and 'having parts or elements logically linked together.'" *Sweeny*, 226 S.W.3d at 592 (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 525 (11th ed. 2003) and RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 800 (2d ed. 2001)). A number of courts of appeals have also suggested that a claim that would be a compulsory counterclaim to the governmental entity's claim would also qualify as one that is germane to, connected with, and properly defensive to it. *See, e.g., City of New Braunfels v.*

36

*Carowest Land, Ltd.*, 432 S.W.3d 501, 526-27 (Tex. App—Austin 2014, no pet.); *City of San Antonio v. KGME, Inc.*, 340 S.W.3d 870, 877 (Tex. App.—San Antonio 2011, no pet.); *Tex. Dep't of Transp. v. Crockett*, 257 S.W.3d 412, 416 (Tex. App.—Corpus Christi 2008, pet. denied); *Sweeny*, 226 S.W.3d at 592-93; *City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 383 (Tex. App.—Dallas 2004, no pet.). A counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim[.]" Tex. R. Civ. P. 97(a).

TPProperty alleges that the City breached the Abatement Agreement it entered into with French Quarter. The City alleges that French Quarter breached the Abatement Agreement when it ceased to employ any "'persons that actually office at the property' and when it allowed TPProperty to take title and possession of the subject tracts of real property without seeking or obtaining the consent of the City." For the City to succeed on its counterclaim seeking to recapture and collect the abated ad valorem taxes from 2009 through 2011, it must prove, among other elements, that French Quarter or any allowable assignee, if any, breached the Abatement Agreement. For TPProperty to succeed, it must prove exactly the opposite—that the City breached the Abatement Agreement.

TPProperty alleges that the City breached the HOT Agreement it entered into with French Quarter when it refused to approve the HOT Budget, tried to limit TPProperty's rights to spend the HOT revenues, attempted to terminate the HOT Agreement, demanded additional budgets and reports, and assessed a fifteen percent penalty. The City counterclaimed that TPProperty and its predecessor, French Quarter, have refused to pay hotel occupancy taxes to the City. The City sought judgment against TPProperty for the unpaid taxes, and statutory penalties, attorney's fees, and court costs. TPProperty has alleged that the City is wrongfully attempting to collect these taxes in breach of the HOT Agreement. To succeed on its claim, the City will have to show, among other things, that it is no longer bound by the HOT Agreement. For TPProperty to succeed, contrary findings are required—that the City is bound by the HOT Agreement and did not perform its obligations accordingly.

Here, the City's claims and TPProperty's claims arise from the same transactions—the continued viability of the agreements, the alleged breach of such agreements, and the fulfillment or non-fulfillment of obligations by the parties, if any, under those contracts. Both parties request affirmative relief stemming from the other party's purported breach of the same contracts, and each party's claims rely on the trial court's resolution of similar disputed facts. Therefore, we hold

38

TPProperty's claims for common law breach of contract damages are germane to, connected with, and properly defensive to a portion of the City's counterclaims. Thus, we conclude the City waived its immunity from suit with respect to TPProperty's contract claims, so far as those claims act as offsets to the City's counterclaims. *See Reata*, 197 S.W.3d at 376-77. As illustrated by the Texas Supreme Court, this limited jurisdiction allowable under *Reata* may prove to be an insurmountable obstacle for recovery of any damages in a breach of contract suit. *See Albert,* 354 S.W.3d at 376.

## C. Waiver of Immunity by Conduct

Finally, TPProperty contends that the City waived immunity as it received the benefit of its bargain under the agreements. TPProperty cites one case in support of its position. *See Tex. S. Univ. v. State St. Bank & Trust Co.*, 212 S.W.3d 893, 908 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). In *State Street Bank*, the court held that the university was not immune from suit due to the "'extraordinary factual circumstances'" found in that case. *Id*. at 907-08. The university entered into a contract wherein it agreed to pay approximately $13 million for equipment and services. *Id*. at 908. After the university received the equipment and services, it refused to pay, claiming that the contracts were invalid. *Id*. The court agreed with the following argument made on appeal:

> [T]he injustice is even worse, because this case also includes an additional fact that appears in none of the prior cases: The government officials lured Viron into the Master Lease with false promises that the contract would be valid and enforceable, then disclaimed any obligation on the contract by taking the position that the contract was not valid after all.

*Id.* at 908. Considering the facts in that case, the court held that sovereign immunity did not shield the university from a breach of contract claim. *Id.* We find nothing in the facts of this case that rise to the same level as those extraordinary facts presented in *State Street Bank*. Moreover, the Texas Supreme Court has expressly refused to recognize a waiver of immunity by conduct in a breach of contract suit against a governmental entity. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414 (Tex. 2011). We, therefore, overrule TPProperty's contention that the City waived immunity by conduct.

## V. Claims for Specific Performance

TPProperty's pleadings identify its request for specific performance as a separate cause of action. However, in its brief, TPProperty concedes that it seeks specific performance only as a remedy for the City's breach of the HOT Agreement and the Abatement Agreement, if any. Because of TPProperty's concession, we do not need to address its request for specific performance as a separate cause of action.

## VI. Exhaustion of Administrative Remedies

The City argues that TPProperty's claims regarding the Abatement Agreement amount to a complaint about the City's denial of a tax exemption. The City contends that the only legal significance of TPProperty's claims under the Abatement Agreement is whether TPProperty is entitled to retain the tax exemption promised in the agreement. Because the Tax Code provides the exclusive remedies for the resolution of disputes over the denial of a tax exemption, the City argues that TPProperty was required to exhaust its administrative remedies prior to seeking relief in the trial court. The City contends that TPProperty's failure to exhaust its administrative remedies deprives the court of jurisdiction to decide the matter.

The statutory administrative review requirements of the Tax Code are mandatory and jurisdictional. *See, e.g., Cameron Appraisal Dist. v. Rourk*, 194 S.W.3d 501, 502 (Tex. 2006) (per curiam); *Matagorda Cnty. Appraisal Dist. v. Coastal Liquids Partners, L.P.*, 165 S.W.3d 329, 331 (Tex. 2005). The legislative policy behind the exhaustion of administrative remedies doctrine is to allow the agency involved to "resolve disputed issues of fact and policy" and "to assure that the appropriate body adjudicates the dispute[.]" *Essenburg v. Dallas Cnty.*, 988 S.W.2d 188, 189 (Tex. 1998). The policy also seeks "to encourage parties to

resolve their dispute without resorting to litigation when an administrative procedure is provided for that purpose." *Vela v. Waco Indep. Sch. Dist.*, 69 S.W.3d 695, 702 (Tex. App.—Waco 2002, pet. withdrawn). There are exceptions to this doctrine: (1) where an injunction is sought and irreparable harm would result; (2) where the administrative agency cannot grant the requested relief; (3) when the issue presented is purely a question of law; (4) where certain constitutional issues are involved; and (5) where an administrative agency purports to act outside its statutory powers. *Gibson v. Waco Indep. Sch. Dist.*, 971 S.W.2d 199, 201-02 (Tex. App.—Waco 1998), *vacated on other grounds*, 22 S.W.3d 849 (Tex. 2000).

## A. The Tax Code

## 1. Taxing Unit's Authority to Exempt Property

Article VIII, section 1-g of the Texas Constitution permits the Legislature by general law to authorize "cities, towns, and other taxing units to grant exemptions or other relief from ad valorem taxes on property located in a reinvestment zone for the purpose of encouraging development or redevelopment and improvement of the property." Tex. Const. art. VIII, § 1-g(a). Chapter 312 of the Tax Code was enacted as enabling legislation for this constitutional provision. *See* Act of Aug. 10, 1981, 67th Leg., 1st C.S., ch. 5, § 9, 1981 Tex. Gen. Laws 53, 57 (making the Act effective on the constitutional amendment's adoption date). Chapter 312

permits a taxing unit to enter into tax abatement agreements with owners of real property located in a reinvestment zone if the governing body of the municipality or county "has established guidelines and criteria governing tax abatement agreements by the taxing unit and a resolution stating that the taxing unit elects to become eligible to participate in tax abatement." Tex. Tax Code Ann. § 312.002(a) (West 2015).

The tax exemption created by a tax abatement agreement is subject to the Tax Code provisions that generally apply to property tax exemptions. *See Fina Oil & Chem. Co. v. Port Neches I.S.D.*, 861 S.W.2d 3, 6-7 (Tex. App.—Beaumont 1993, writ denied) (holding Tax Code section 11.43(h) notice provision applied to cancellation of partial exemption created by abatement agreement). Chapter 11 of the Tax Code provides that the owner of real property subject to a chapter 312 tax abatement agreement is entitled to a tax exemption as provided by the agreement. *See* Tex. Tax Code Ann. § 11.28 (West 2015). Section 11.42(a) generally provides that "eligibility for and amount of an exemption authorized by this chapter for any tax year are determined by a claimant's qualifications on January 1." *Id*. § 11.42(a).[8] "A person who does not qualify for an exemption on January 1 of any year may not receive the exemption that year." *Id*. Section 22.02 of the Tax Code

---

[8] We cite to the current version of the statute, as later amendments do not affect the disposition of this appeal.

provides that "[i]f an exemption applicable to a property on January 1 terminates during the tax year, the person who owns or acquires the property on the date applicability of the exemption terminates shall render the property for taxation within 30 days after the date of termination." *Id.* § 22.02(a).

**2. Chief Appraiser Determines Right to Exemptions**

To obtain the exemption, the person claiming the exemption must file an application with the chief appraiser of the appraisal district. *Id*. § 11.43(a). The chief appraiser is statutorily charged in the first instance with determining whether property is tax exempt. *See id.* § 11.45(a). The chief appraiser determines a property owner's right to an exemption based on the claimant's qualifications as of January 1. *See id*. §§ 11.42(a), 11.45(a). The chief appraiser's initial determination of whether a specific property is exempt from taxation is a fact question. *See id.* § 11.45(a); *Tex. Tpk. Co. v. Dallas Cnty.*, 271 S.W.2d 400, 402 (Tex. 1954). The taxpayer may protest a denial of the application by the appraiser. *See* Tex. Tax Code Ann. §§ 11.45(a), (c), 41.41(a). The protest is determined by the appraisal review board. *See id*. §§ 41.41(a), 41.47(a). A taxpayer may appeal an order of the appraisal review board on such a determination. *See id*. § 42.01(a)(1)(A).

44

### 3. Tax Code Provides Exclusive Procedure to Contest Denial of Exemption

The Tax Code provides administrative procedures for property owners to contest ad valorem taxes. *See* Tex. Tax Code Ann. §§ 41.41-.47 (West 2015); *Rourk*, 194 S.W.3d at 502. The Code vests appraisal review boards with the authority to hear and determine protests filed by property owners. Tex. Tax Code Ann. §§ 41.41, 41.47. Under the statute, a property owner is entitled to protest, before the appraisal review board, a "denial to the property owner in whole or in part of a partial exemption[.]" *Id.* § 41.41(a)(4). The administrative proceedings constitute the exclusive procedure to challenge ad valorem taxes, and most defenses are barred if not raised in the agency. *See id.* § 42.09; *Rourk*, 194 S.W.3d 502. Thus, "'a taxpayer's failure to pursue an appraisal review board proceeding deprives the courts of jurisdiction to decide most matters relating to ad valorem taxes.'" *Rourk*, 194 S.W.3d at 502 (quoting *Matagorda Cnty.*, 165 S.W.3d at 331).

### B. TPProperty is Required to Exhaust its Administrative Remedies

TPProperty argues that it was not required to exhaust administrative remedies under chapters 41 and 42 of the Tax Code because those chapters relate to administrative decisions by the chief appraiser, appraisal district, and appraisal review board. According to TPProperty, because the City, not an administrative agency, terminated the Abatement Agreement, there was not a decision that

45

required administrative review. TPProperty characterizes this case as a contract dispute over whether the City properly terminated the Abatement Agreement, not a tax dispute relating to an action by an administrative agency. In its live pleading, TPProperty complains of the City's "attempt to 'recapture' tax revenues from TPProperty that were abated under the Abatement Agreement during the time French Quarter owned the Hotel." TPProperty further complains that the City has "directed the Tax Assessor to recapture those taxes from TPProperty[.]" TPProperty seeks specific performance of the Abatement Agreement. TPProperty complains that the City has improperly attempted to levy penalties, fines, and liens against the Hotel. TPProperty seeks a declaration as part of its suit that it had no obligation to pay back taxes, that neither the City nor the tax assessor was entitled to recapture back taxes from TPProperty, to place tax liens on the Hotel related to the Abatement Agreement or assess any penalties or interest on TPProperty related to the Abatement Agreement, and that the City is only entitled to collect taxes as provided in the Abatement Agreement.

## C. TPProperty Has Not Exhausted Its Administrative Remedies

TPProperty does not dispute the fact that it did not seek administrative relief prior to filing suit in the trial court. However, in its appellate brief, TPProperty contends that it has "complied with the administrative process to date[.]"

46

According to the record, the chief appraiser made a determination that the tax exemption for the Hotel for the years 2009 through 2013 should be disallowed because the City adopted a resolution finding the Abatement Agreement to be in default. TPProperty filed a protest of the chief appraiser's decision. Both parties acknowledge that the chief appraiser has not rendered a decision on TPProperty's protest. Therefore, it is undisputed that the administrative review process is incomplete.

The record shows that TPProperty brought this suit in May 2012, after the City passed a resolution declaring the Abatement Agreement in default and terminated. Despite the date of such resolution, the appraisal district did not send notice of cancellation of the tax exemption until June 2013. As we noted, the Tax Code provides that the chief appraiser determines a property owner's right to an exemption based on the claimant's qualifications as of January 1. See §§ 11.42(a), 11.45(a). The City filed its original counterclaim in June 2012, and did not file its plea to the jurisdiction until September, 2013. Therefore, at the time TPProperty filed its lawsuit and the City filed its answer and counterclaim, the appraisal district had not assessed any further taxes or otherwise cancelled any tax exemption of the subject property. Therefore, it is clear that at the time the trial court acquired jurisdiction of this suit, the appraisal district could not have granted

the requested relief. Thus, we find an exception to the general rule requiring exhaustion of administrative remedies applies to the unique facts of this case. *See Gibson,* 971 S.W.2d 199, 201-02; *Mag-T, L.P. v. Travis Cent. Appraisal Dist.,* 161 S.W.3d 617, 625 (Tex. App.-Austin 2005, pet. denied) (enumerating exceptions that excuse a party from exhausting administrative remedies). Once a governmental entity has asserted an affirmative claim for monetary relief, whether by filing suit or by counterclaim, the trial court acquires jurisdiction over the entity's claims and certain offsetting, defensive claims asserted against the entity. *Albert,* 354 S.W.3d at 375. "That is not because the entity effected a change in its immunity by filing a claim, but because the judiciary has abrogated the entity's common law immunity from suit as to certain offsetting claims." *Id.* We conclude the trial court did not err in denying the City's plea to the jurisdiction on the City's claim that TPProperty failed to exhaust its administrative remedies.

## VII. Declaratory Judgment Claims

TPProperty also seeks declaratory relief relating to the Abatement Agreement and the HOT Agreement. The Uniform Declaratory Judgment Act ("DJA") is a remedial statute and "its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]"

Tex. Civ. Prac. & Rem. Code Ann. § 37.002 (West 2015); *IT-Davy*, 74 S.W.3d at

855. The Act provides:

> A person interested under a deed, will, written contract, or other
> writings constituting a contract or whose rights, status, or other legal
> relations are affected by a statute, municipal ordinance, contract, or
> franchise may have determined any question of construction or
> validity arising under the instrument, statute, ordinance, contract, or
> franchise and obtain a declaration of rights, status, or other legal
> relations thereunder.

Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). "The DJA does not extend a trial

court's jurisdiction, and a litigant's request for declaratory relief does not confer

jurisdiction on a court or change a suit's underlying nature." *IT-Davy*, 74 S.W.3d at

855. The DJA provides a waiver of governmental immunity, but it is limited in

scope to certain declaratory claims against governmental entities challenging the

validity of certain legislative enactments. *Carowest Land*, 432 S.W.3d at 530; *see*

*also* Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b) (West 2015) ("In any

proceeding that involves the validity of a municipal ordinance or franchise, the

municipality must be made a party . . . .").

TPProperty seeks the following declarations: (1) that the Abatement

Agreement has been transferred from French Quarter to TPProperty; (2) that

TPProperty has succeeded to the interests of French Quarter under the Abatement

Agreement; (3) that TPProperty is not in breach of any of the material terms and

49

provisions of the Abatement Agreement; (4) that TPProperty has performed under the Abatement Agreement; (5) that TPProperty has no obligation for any back taxes under the Abatement Agreement; (6) that neither the City of Conroe nor its tax assessor is entitled to recapture any back taxes from TPProperty related to the Abatement Agreement; (7) that neither the City of Conroe nor the tax assessor is entitled to place any tax liens on the Hotel related to the Abatement Agreement; (8) that neither the City of Conroe nor its tax assessor is to assess any penalties or interest against TPProperty related to the Abatement Agreement; (9) that the Abatement Agreement is a valid and binding agreement pursuant to which TPProperty can submit tax abatement applications to MCAD; (10) that MCAD is not entitled to fail to process TPProperty's tax abatement applications under the Abatement Agreement; (11) that TPProperty has succeeded to the interests of French Quarter under the HOT Agreement; (12) that TPProperty is not in breach of any of the material terms and provisions of the HOT Agreement; (13) that TPProperty has performed under the HOT Agreement; (14) that neither the City of Conroe nor the tax assessor is to assess any penalties or interest on TPProperty related to the HOT Agreement; (15) that the City of Conroe is not entitled to recapture any back taxes from TPProperty related to the Abatement Agreement or

the HOT Agreement; and (16) the tax assessor is not entitled to collect any future taxes except pursuant to the Abatement Agreement.

The City contends that suits to establish a contract's validity, enforce its performance, or impose its liabilities are barred by immunity. According to the City, TPProperty is essentially trying to avoid immunity by framing its breach of contract claims as a suit seeking declaratory relief. Most of the declarations TPProperty seeks would have the effect of establishing the parties' rights and liabilities under the agreements. We have held the very issues these declarations seek to affirm are within the trial court's jurisdiction to adjudicate by virtue of the City's limited waiver of immunity arising from the City's counterclaims seeking monetary relief. *See Carowest Land*, 432 S.W.3d at 534. We conclude the trial court did not err in denying the City's plea to the jurisdiction as to TPProperty's claims seeking declarations that have the effect of establishing the parties' rights and liabilities under the Abatement Agreement and the HOT Agreement.

## VIII. Conclusion

Based on the foregoing analysis, we affirm the trial court's order denying the City's plea to the jurisdiction, but only to the limited extent that any allowable claims of TPProperty may properly offset any recovery by the City on its counterclaims.

51

AFFIRMED AS MODIFIED.


                                       _____

                                         CHARLES KREGER
                                               Justice


Submitted on February 27, 2014
Opinion Delivered June 25, 2015


Before McKeithen, C.J., Kreger, and Horton, JJ.